### PARKS-CRAMER CO. v. AMERICAN MOISTENING CO.

(Circuit Court of Appeals, First Circuit. March 21, 1923.)

No. 1550.

**Patents ⬤⇒328—1,331,981, for humidity regulator for mills, held not infringed.**

The Cramer & Hodge patent, No. 1,331,981, for a humidity regulator for cotton mills, *held* not infringed, in view of the prior art, which limits the range of equivalents to which it is entitled.

Appeal from the District Court of the United States for the District of Massachusetts; George W. Anderson, Judge.

Suit in equity by the Parks-Cramer Company against the American Moistening Company. Decree for defendant, and complainant appeals. Affirmed.

Nathan Heard, of Boston, Mass. (Frederick A. Tennant, of Boston, Mass., on the brief), for appellant.

J. L. Stackpole, of Boston, Mass. (Frederick P. Fish and H. M. Holmes, both of Boston, Mass., on the brief), for appellee.

Before BINGHAM and JOHNSON, Circuit Judges, and MORRIS, District Judge.

JOHNSON, Circuit Judge. This is an appeal from a decree of the District Court of Massachusetts dismissing the bill of the plaintiff in a patent infringement case.

The patent in suit, No. 1,331,981, was issued February 24, 1920, on an application filed December 26, 1907, to the plaintiff as assignee of the inventors, Stewart W. Cramer and William B. Hodge.

The invention relates to apparatus for regulating the humidity in mills, particularly cotton mills, by automatically controlling the amount of moisture in the air of the rooms in which the different processes of manufacture are carried on.

While the application of the plaintiff was pending in the Patent Office, the defendant became the owner, by assignment, of patent No. 1,032,189, issued to E. W. Comfort July 9, 1912, on an application filed August 2, 1911, and a few regulators made under this patent were put on the market, which were not entirely satisfactory. Their defects were later remedied by an invention for which a patent was issued to the same patentee, No. 1,122,077, December 22, 1914, on an application filed June 9, 1914. The defendant became the owner of this patent, and has put upon the market a humidity regulator made in accordance with it, whose practical utility has been recog-

nized by the public, and has been installed in many cotton mills in the United States. The usual defenses of nonvalidity and noninfringement are made.

Neither the plaintiff nor its predecessors have ever manufactured and put upon the market any regulators like that shown at the trial as embodying the principles of the patent in suit. Both the patent in suit and that of the defendant use as an effectuating energy the differential force resulting from the expansion and contraction under variable temperatures of a dry and wet element, the former being subject to the temperature of a room and the latter being kept at a lower temperature than the former by evaporation, which takes place in a wet covering surrounding it, or in a current of moist air which is caused to flow over it. The difference between the temperatures indicated by the two elements is known as the wet-bulb depression. Two forms embodying the principles of the patent in suit are shown in the drawings, but it is only the one in which the thermo-expansive elements are two bars of metal, having a very slight coefficient of expansion, that it is necessary to consider in connection with the defendant's device. The thermo-expansive elements are metal bars, one being the dry and the other the wet element. We are told that these bars may consist of any suitable metal, preferably invar steel, which has a very small coefficient of expansion; that they may be made of any length and of any material; and that the forces and movements exerted by each, under all temperature conditions, are determinate and adjustable. These two thermo-responsive elements are separately mounted, and each acts upon a separate interposed leverage system referred to in the patent as a humidity controlling device or the energy controlling device. The bar which constitutes the dry element is secured in a frame. Its upper end is pressed against an adjusting screw by the tension of a spring, which pulls down the right hand of a lever against which the lower end of the bar presses. The lever is provided with ratchet teeth, which mesh with a pinion mounted in a portion of the frame in which the bar is mounted, and which carries a vertical arm *1* having an enlargement at its upper end.

The wet element consists of a similar bar around which is indicated a stocking, which is kept moist. This bar rests at its lower end on another level, and its upper end is held against an adjusting screw by tension of another spring, which tends to lift up the left-hand end of that lever. The left-hand end of this lever is provided with ratchet teeth, which mesh with a pinion mounted in a portion of the frame in which the lever is pivoted, and which also supports the wet element. Fastened to this pinion is a pair of arms, *2* and *3* which extend upward on each side of the enlargement at the end of arm *1*. When the dry element expands it swings the arm *1* to the right, and when it contracts it permits the spring to pull up the lever and cause the arm *1* to swing to the left. When the wet element expands it pushes down the lever with which it contacts, and swings the arms *2* and *3* to the right. When it contracts it permits a spring to pull up the lever, whose teeth mesh with those of a pinion, and swings the pair of arms *2* and *3* to the left. As the temperatures of both ele-

ments rise or fall, the arms *1*, *2* and *3* are swung to the right or left, respectively, and are said to follow each other up. If the pair of arms *2* and *3* move faster or slower than the arm *1*, contact will be made between the arm *2* or the arm *3*, as the case may be, with the enlargement on the arm *1*, and a change will be made in the action of the humidifiers. When the arm *1* is in contact with arm *2*, the humidifiers are off or shut. When the arm *1* is in contact with arm *3*, the humidifiers are on or open. By means of a screw at the top of the wet element it may be set so as to have any desired depression below the dry element, within a practical range, and, whether the temperature of the room rises or falls, this constant wet-bulb depression will be maintained, and by a slight deviation therefrom the humidifiers will either be turned on or turned off. This adjustment, which is obtained by turning the screw at the top of the wet element, moves the wet element bodily up or down, and is called the depression adjustment. By means of a pointer, with which the screw is provided, the exact depression desired may be obtained upon the scale over which the pointer moves, and a given mean depression may be maintained under all changes of temperature in the room. . This is not enough to satisfy all the requirements of humidity regulation in textile mills because, when the temperature of the air increases, it is capable of holding a greater amount of moisture and the apparatus is provided with a mechanism which makes it capable of maintaining a given percentage of relative humidity at any temperature within a prescribed range. The adjustment made by this mechanism is known as the adjustment for variable depression, or, more briefly, as the ratio adjustment, and is obtained by setting the pinion which is the axis of the pair of arms *2* and *3* of the wet element in a definite vertical position with relation to the vertical position of the pinion which is the axis of the arm *1* of the dry element. This can be done by means of an adjustment screw, which lowers the pinion which actuates the arms *2* and *3*, below the pinion which actuates the arm *1*. If these two pinions were in the same vertical position, the distance from each to the points of contact on the arms actuated would be the same; and for every degree of expansion and contraction of the two elements these points would be swung, respectively, to the left or to the right to the same extent and with the same speed. But when the pinion which is the axis of the arms *2* and *3* is set below the pinion which is the axis of the arm *1*, the points of contact upon the arms *2* and *3*, having a longer leverage, will move faster than the enlargement *21* on the arm *1*, and the ratio in which the wet-bulb depression increases as the temperature of the room rises will be in direct proportion to the ratio between the leverages of the points of contact on the arms *2* and *3* and that of the enlargement on the arm *1*. By this ratio adjustment the energy exerted by the expansion or contraction of the wet element is made to vary relatively to that of the dry element in accordance with the rise or fall in the temperature of the room, so that a constant percentage of relative humidity is preserved at all temperatures within a prescribed range covering temperatures

in a textile mill. Concisely stated, the mechanism of the patent provides for the accomplishment of three purposes:

First. The opening and closing of the sprayer valves by means of the differential between the energy developed by contraction or expansion of the dry and the wet element.

Second. The depression bodily of the wet element, so that it may be set for any desired low bulb depression.

Third. The adjustment of the energy resulting from contraction or expansion of the wet-bulb ·element, so that, when it is applied in conjunction with the energy produced by the contraction or expansion of the dry-bulb element, it may have a determinate ratio in relation to the latter and produce an increase of the wet-bulb depression which shall vary in the same ratio with the rise in temperature of the dry element.

It is known that all textile fabrics gain in weight by absorbing moisture from the air, and by careful experiments extended over many observations, the amount which cotton yarn will gain in weight when exposed to the air at different temperatures and under different percentages of relative humidity has been ascertained, and this gain in weight is designated as cotton regain, and is shown in terms of percentage, indicating the amount in weight which the yarn will acquire under these different conditions over its practically dry condition. A chart had been prepared in which the percentages of relative humidity under different temperatures has been translated into percentages of cotton regain, so that, if the relative humidity at a certain temperature be given, the cotton regain which is equivalent thereto may be correctly ascertained.

The regulator can be so set that the sprayer valves admitting water to the air of the room can be turned on or off as the temperature falls slightly below or rises slightly above the line indicating the desired line of cotton regain. When the instrument has been correctly set from the information obtained by the charts and the use of the sling psychrometer, to determine existing conditions of the air as to temperature and humidity, it will keep the air of the room at the desired relative humidity, which corresponds with the line of cotton regain which it is desired to follow, or, in other words, the air will always have, at any temperature, the percentage of relative humidity which may be desired for successful manufacturing operations.

The defendant's regulator, as disclosed by the drawings, is substantially as follows: It consists of a dry and a wet element, each of which is made of a bar of invar steel and inclosed within a hollow receptacle made of hard rubber, having a well-known coëfficient of expansion and contraction. They are so arranged that the energy created by the expansion or ·contraction in each is applied to the same lever bar to produce opposite effects, which are the resultants of these opposed forces; so that, if one is exerted to raise the lever bar from the valve which controls the sprayer system, that of the other tends to hold it down. Obviously, if the forces exerted are the same under equal conditions, one neutralizes the other and the· position of the lever bar is not changed. It is only the differential between them

that causes its position to be changed and the lever to be raised or lowered, thus opening or closing the valve which it controls.

When the dry element expands, it tends to raise the bar above the valve and open it. When the wet element expands, it tends to close the valve. When the dry element contracts, it tends to close the valve; and when the wet element contracts, it tends to open the valve.

The depression of the wet bulb is obtained by use of a screw at the top of the dry element, which may be so turned upon a scale there indicated that the instrument may be made to preserve the desired wet-bulb depression. Then, as in the regulator of the plaintiff, the humidifiers will be turned on or off as the wet-bulb depression rises above or falls below this depression, and a constant mean depression of the wet-bulb element will be preserved. In order, however, to give the relative percentage of humidity desired when the temperature of the air of the room increases and the relative percentage of humidity which corresponded to a lower temperature no longer expresses the desired relative humidity of the air, the regulator is provided with an adjustment for securing this, which is known as the "ratio adjustment for variable depression." This is obtained by changing the angle of the lever bar, which closes the valve and which is acted upon by both elements, so that the force exerted by the contraction or expansion of one element is made more effective than the same force exerted by the contraction or expansion of the other element. The angularity of this bar may be so adjusted, in accordance with a scale upon which are indicated percentages of relative humidity and cotton regain, that constant relative humidity conditions may be maintained.

In the defendant's regulator both the dry and wet elements act upon the same lever and the ratio of adjustment for variable depression is obtained by varying the angularity of this lever; while in the plaintiff's regulator each element acts upon a separate lever and the wet-bulb depression required to give a constant relative percentage of humidity is obtained by changing the axis of the arms of the wet element with reference to that of the arm of the dry element, each regulator seeks to utilize in a manner which might broadly be considered equivalent, the principle of obtaining the desired variable depression and changing the effective force of the contraction or expansion of one of the elements in relation to the other by making one less or more effective than the other at the point where the force is applied.

If the plaintiff was the discoverer of the principle that a determination of the ratio between the effective energies exerted by the wet and dry bulb elements could be so proportioned that a determinate ratio of relative movements between the same would result, and that the forces exerted by them would cause an instrument for regulating the humidity in the air, so that it may have, in varying temperatures, a constant percentage of relative humidity, or, as expressed by the experts who testified in this case, cause it to follow a line of constant percentage of relative humidity or of constant regain, we think his device would be entitled to a range of equivalents broad enough to cover the device of the defendant.

While the defendant contends that it makes use of the joint action of the effective energy of the two elements, and the plaintiff employs the differential action of the two elements, we think that both employ the resultant of the energies developed by these respective elements. That this resultant force could be utilized in instruments designed to regulate humidity, and so constructed as to turn on or off the sprayers which would admit moisture to the room, was known long before either the plaintiff or defendant made their devices.

Bradford in 1879 showed in his patent, No. 222,234, issued December 2, 1879, a regulator operated through the energy supplied by the resultant of the forces created by the contraction and expansion of wet and dry bulb elements and also showed an adjustment for the depression of the wet-bulb element, so that a desired wet-bulb depression could be obtained. Since Bradford many regulators have been devised, some of which have been patented and cited in this case, which utilize the familiar laws of humidity. It is said that, while Bradford did not claim in his regulator any adjustment for variable depression to procure a constant percentage of relative humidity, nevertheless, it is apparent from what he disclosed that the desired ratio of variable depression might be obtained by making the wet and dry bulb elements of different coefficients of expansion.

Cramer, in his patent, No. 856,944, dated June 11, 1907, seems to have provided for a ratio of variable depression by introducing an adjustable shunt resistance into one of the circuits of the "Wheatstone bridge," the principle of which he utilized for the humidifier which he there describes. He employs, however, the difference in effectiveness of electric currents, and in his patent states:

"Whereas, as a matter of fact, the fixed depression of the wet-bulb thermometer is not all that is desired, a variable depression of said thermometer must be provided for. This is accomplished by introducing a shunt $D$, around one of the thermometers so that the total resistance in $D$, varies according to any predetermined scale and consists of the total resistance of the shunt $D$, and the variable resistance of the thermometer due to atmospheric changes. * * * It will thus be seen that any predetermined scale of depression of the wet-bulb thermometer can be provided for in the construction of the instrument."

In Carrier, No. 896,690 and No. 902,713, the wet and dry bulb elements consist of bars, and a comparison can be more easily made between them and the patent in suit than any of the other patents cited.

We think the inventive idea which appears in both the patent in suit and the defendant's device is found in both these patents. In these the dry element is a hollow cylinder which incloses the wet element, some space being left between them. The wet element is carried on a screw threaded into a part to which the lower end of the dry element is also attached. The wet element is surrounded by a wet wick in No. 896,690, and is acted upon by a current of moist air in No. 902,713. The dry element is secured at its top to a casing to which a lever bar is pivoted. The upper end is free to move. It has a hollow plug fitted into it which has knife edges upon opposite sides, on which the lever bears when it is in contact with the wet element. The end

of the lever operates a valve which regulates the admission of water to the air of the room. As in Bradford's and in other humidifiers, the lever is actuated by the differential between the forces developed by the expansion or contraction of the two elements. This was old; nor was there any new inventive thought in providing a constant wet-bulb depression. The ratio adjustment which would provide a constant percentage of relative humidity under all temperatures within a prescribed range was the principle which distinguishes the mechanical type of regulator shown by Carrier from others of this type, although it embodies the same principle or inventive idea contained in the electrical device shown by Cramer in No. 856,944.

Carrier shows one method of making the ratio adjustment for variable depression to obtain a desired percentage of relative humidity, and in his specification says of his device:

"The device is preferably provided with adjustment means whereby it is possible to vary the ratio of expansion of its elements to correspond to the ratio existing between the variations in the wet bulb depressions and the variations in dry bulb temperatures, within the prescribed range, and thus obtain an approximately constant percentage of relative humidity for any given range of temperatures."

He has shown one method of making the ratio adjustment which will secure an approximately constant percentage of relative humidity. His application was filed October 11, 1907; but it appears in the record that he conceived, disclosed, and made drawings of his invention as early as April, 1907, and it is admitted that Carrier's patents are part of the prior art in relation to the patent in suit.

While the patent in suit was placed in interference with Carrier in the Patent Office, and certain amendments were made by which the patent in suit was held by the Patent Office not to have been anticipated by Carrier, it is claimed that the action of the Patent Office was influenced by the affidavits filed by the solicitors of the patent in suit, which showed a suppression of knowledge of the Carrier invention at the time of the filing of the application for the patent in suit.

We pass this contention, as well as the prima facie evidence of the validity of the patent in suit, resulting from the decision of the Patent Office, as not involved in the question which we are pursuing, which is whether in the prior art, as shown especially by Carrier, there was the inventive idea which controlled the ratio of contraction or expansion of the two thermo elements, so that a constant percentage of relative humidity might be maintained under all temperatures within a prescribed range. If such an inventive idea is shown, then the patent in suit would not be entitled to the broad range of equivalents accorded a pioneer patent, but would be restricted to a reasonable range of equivalents commensurate with the improvement which it had made upon the prior art.

The difficulty with the Carrier patents, which made them impracticable, as testified to by Carrier himself, was the difficulty of so insulating the wet element from the dry element in his regulator that the moisture applied to the wet element, either by a wick inclosing it

or by passing a column of saturated air over it, should not affect the dry element, which immediately surrounded it. This was overcome by the patent in suit by placing each of the elements upon separate supports and causing the effective force of the expansion and contraction of each to be applied to a separate lever. In doing this, however, the inventive idea which underlies the ratio adjustment, which Carrier obtained by shortening the effective length of the wet element and causing it to have a different coefficient of expansion from the dry element, was still utilized by the patent in suit, for in it the effective energy of the contraction and expansion of the dry and wet elements are exerted each upon its respective lever with a pinion to which is attached the resilient bar or pointers, that are turned either to the right or to the left to correspond to the expansion or contraction of the respective elements.

Whether the effectiveness of the force of contraction and expansion in one of the elements was lessened by shortening the element and giving it a different coefficient of expansion, as in the Carrier patent, or by lowering the pinion that forms the axis which controls the movement of the bifurcated arms at the points of contact, the principle employed is the same, namely, the control of the energy resulting from the contraction and expansion of the wet element in its relation to the energy developed by the expansion and contraction of the dry element, so that there shall exist between the two a definite predetermined ratio, which, under all temperatures, will produce the same percentage of relative humidity. Whether this was accomplished as in Carrier, by shortening the effective length of the dry element and giving it a different coefficient of expansion, or as in the patent in suit by translating that energy to a lever and then to a pinion meshing with the lever, which pinion constitutes the axis of the arms of the wet element designed to make a contact with the arm attached to the pinion, actuated by the expansion and contraction of the dry element, the result accomplished was the same, and the means of accomplishment, while different in form and carried out through other intervening means not employed by Carrier, adopted the same inventive idea, and what Carrier had taught was put into practical use by instrumentalities different from those employed by him. After Carrier there could not be any patent entitled to a broad range of equivalents which covered the principle which he made public.

The patent in suit points out a practical application of these principles by one method and the defendant does so by another, which in many striking features differs from that of the patent in suit, particularly as to the means of obtaining the variable depression, which it is admitted was essential to make either the device of the patent in suit or that of the defendant of practical use in manufacturing establishments where the temperature varies within quite a large range, so that, even when the temperature outside the mill where the regulator is used may change but little, the temperature of the air in the room from the time when the operation of the mill is commenced in the morning until noon increases largely, due not only to artificial means of

heating, but to the operation of machinery and the presence of many operatives.

While the patent in suit accomplishes this purpose by establishing a contact which will turn on or turn off the humidifiers which supply moisture to the room in accordance with the ratio established between the effective movements of the two thermal elements, transferred to resilient arms actuated each by a separate pinion and lever, the defendant does this by causing these elements to act upon one lever, and by changing the angularity of the valve controlling device establishes the ratio to be preserved between the effective movements of both elements under all conditions of temperature.

The result accomplished by both is the same; but, in view of the prior art, we think the defendant's device is not included within the reasonable range of equivalents to which the patent in suit is entitled.

The decree of the District Court is affirmed, with costs to the appellee in this court.